# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| R.A. FEUER, suing derivatively on behalf of CBS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 12575-CB |
| SUMNER M. REDSTONE, SHARI REDSTONE, DAVID ANDELMAN, JOSEPH A. CALIFANO, JR., WILLIAM S. COHEN, GARY L. COUNTRYMAN, CHARLES K. GIFFORD, LEONARD GOLDBERG, BRUCE S. GORDON, LINDA M. GRIEGO, ARNOLD KOPELSON, LESLIE MOONVES, DOUG MORRIS, and FREDERIC V. SALERNO, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CBS CORPORATION, | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 16, 2018
Date Decided: April 19, 2018

Norman M. Monhait and P. Bradford deLeeuw of ROSENTHAL MONHAIT & GODDESS, P.A., Wilmington, Delaware; Richard D. Greenfield, Marguerite R. Goodman, and Ilene Freier Brookler of GREENFIELD & GOODMAN, LLC, New York, New York; Michael D. Donovan of DONOVAN AXLER, LLC, Berwyn, PA; *Counsel for Plaintiff.*

Kurt M. Heyman, Patricia L. Enerio, and Melissa N. Donimirski of HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Paul Vizcarrondo, Jonathan Moses, Lauren Kofke, and Courtney Heavey of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Counsel for Defendants David Andelman, Joseph A. Califano, Jr., William S. Cohen, Gary L. Countryman, Charles K. Gifford, Leonard Goldberg, Bruce S. Gordon, Linda M. Griego, Arnold Kopelson, Leslie Moonves, Doug Morris, and Nominal Defendant CBS Corporation.*

A. Thompson Bayliss, Michael A. Barlow, and David A. Seal of ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michael C. Tu of ORRICK, HERRINGTON & SUTCLIFFE LLP, Los Angeles, California; Robert N. Kliger of HUESTON HENNIGAN LLP, Los Angeles, California; *Counsel for Defendant Sumner M. Redstone.*

Anne C. Foster, Lisa A. Schmidt, and Kevin M. Gallagher of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Elizabeth B. Burnett and Laurence A. Schoen of MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., Boston, Massachusetts; Wynter L. Deagle of MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., San Diego, California; *Counsel for Defendant Shari E. Redstone.*

Edward B. Micheletti and Bonnie W. David of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Jay B. Kasner of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Counsel for Defendant Frederic V. Salerno.*

**BOUCHARD, C.**

This stockholder derivative suit alleges that Sumner Redstone, the controlling stockholder, former Executive Chairman, and now Chairman Emeritus of CBS Corporation, became incapacitated around the time he turned 91 years old in May 2014 such that he could no longer provide any services of value for the company. According to plaintiff, CBS's directors were aware of Redstone's debilitated state and inability to make any substantive contribution to the company's affairs, yet still approved over $13 million in cash compensation for him over the next few years. Plaintiff contends that these payments constitute a waste of corporate assets and were made in bad faith, and that Redstone has been unjustly enriched.

This court has commented many times on the difficulty of pleading a viable claim for waste against a corporate director under our law. But the particularized allegations of the complaint here depict an extreme factual scenario—one sufficiently severe so as to excuse plaintiff from having to make a demand on the CBS board of directors to press claims concerning certain (but not all) of the challenged payments, and to permit plaintiff to take discovery so that an evidentiary record may be developed before the court adjudicates whether those payments were made in accordance with the directors' fiduciary duties.

For this reason, as explained in greater detail below, defendants' motion to dismiss the complaint under Court of Chancery Rules 23.1 and 12(b)(6) is granted in part and denied in part.

## I. BACKGROUND

Unless noted otherwise, the facts recited in this opinion are based on the allegations of the Amended Verified Derivative Complaint (the "Amended Complaint")[1] and documents incorporated therein.[2]  Any additional facts are either not subject to reasonable dispute or subject to judicial notice.

### A. The Parties

Nominal defendant CBS Corporation ("CBS" or the "Company") is a Delaware corporation headquartered in New York, New York.  CBS is a mass media company with operations in entertainment, cable networks, publishing, and local broadcasting.

Before 2006, CBS was part of the former Viacom Inc., a media conglomerate. In January 2006, that entity was split into two publicly traded companies:  one retained the Viacom name and the other is CBS.  CBS has two classes of stock,

---

[1] Amended Verified Derivative Complaint (Dkt. 46).

[2] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citations omitted) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).  Plaintiff made a Section 220 demand on March 29, 2016, but the parties did not reach any understanding as to how the documents could be used if litigation ensued.  Tr. 81-82 (Sept. 15, 2017) (Dkt. 80).  Accordingly, I consider the actual terms of the documents produced in the Section 220 demand and referenced in the Amended Complaint, but do not consider those documents for the truth of the matters asserted therein unless such content is corroborative of a matter that is not subject to reasonable dispute or subject to judicial notice.

voting Class A shares and non-voting Class B shares, both of which trade on the New York Stock Exchange.

Sumner Redstone is the controlling stockholder of CBS. His controlling interest can be traced to the Sumner Redstone National Amusements Trust, which is the controlling stockholder of National Amusements, Inc., which in turn owns 79.5% of the Class A shares of CBS.

On July 20, 2016, when this action was filed, the CBS Board of Directors (the "Board") consisted of thirteen directors, all of whom are individual defendants in this action: David Andelman, Joseph Califano, Jr., William Cohen, Gary Countryman, Charles Gifford, Leonard Goldberg, Bruce Gordon, Linda Griego, Arnold Kopelson, Leslie Moonves, Doug Morris, Shari Redstone (Redstone's daughter), and Redstone.[3] The Amended Complaint also names as a defendant Frederick Salerno, who was a CBS director from 2007 until May 2016, during which period the payments challenged here were approved.[4]

The Amended Complaint, which was filed on January 19, 2017, defines the period relevant to this action as the period "from approximately the end of May 2014 through the present" (the "Relevant Period").[5] Four members of the Board were

---

[3] Am. Compl. ¶¶ 20-32.

[4] Am. Compl. ¶ 33.

[5] Am. Compl. ¶ 2 n.1.

members of the Compensation Committee during the Relevant Period: Cohen, Gifford, Gordon, and Morris.[6] Three members of the Board were members of the Nominating and Governance Committee during the Relevant Period: Califano, Countryman, and Gifford.[7] Under its Corporate Governance Guidelines, CBS requires a majority of its directors to be independent under New York Stock Exchange listing standards, including all members of the Compensation and Nominating and Governance Committees.[8]

The Board delegated responsibilities for certain compensation-related matters to the Compensation Committee. According to its charter, the "primary purpose" of the Compensation Committee "is to discharge the responsibilities of the Board relating to the compensation of the Company's executive officers and other senior executives."[9] Throughout the Relevant Period, the Compensation Committee was responsible for setting the level of Redstone's compensation as CBS's Chairman of the Board.[10] This is reflected in the Compensation Committee's charter, which provides that the Compensation Committee shall:

> Review and approve corporate goals and objectives relevant to the compensation of the Chairman of the Board and the Chief Executive

---

[6] Am. Compl. ¶¶ 24, 26, 28, 32.

[7] Am. Compl. ¶¶ 23, 25, 26.

[8] Transmittal Aff. of Jonathan Moses ("Moses Aff.") Ex. 5 at 3-6 (Dkt. 56).

[9] Moses Aff. Ex. 14 at 1.

[10] Am. Compl. ¶¶ 5(b), (d), (e), (g), (n), 51-52, 72-73, 82-83.

Officer. Together with the Nominating and Governance Committee, evaluate annually the performances of the Chairman and the Chief Executive Officer in light of these goals and objectives and report the results of the evaluations to the non-management directors. *The Committee shall set the compensation levels of the Chairman and the Chief Executive Officer taking into account the evaluations.*[11]

Plaintiff R.A. Feuer allegedly has been a stockholder of CBS continuously throughout the Relevant Period.[12]

## B. Overview of Redstone's Employment and Compensation at CBS

Redstone was Chairman of the board of directors of the former Viacom from 1987 through 2005 and its Chief Executive Officer from 1996 through 2005.[13] After CBS split from the former Viacom, Redstone served as Executive Chairman of CBS from January 1, 2006 until February 4, 2016.[14] Redstone also served during this period as Executive Chairman of the post-split Viacom. A challenge similar to the one made here has been made to the cash compensation Redstone received from Viacom after allegedly becoming incapacitated and unable to provide any services of value to that company.[15]

Until his resignation as Executive Chairman in February 2016, Redstone's employment at CBS was governed by an agreement dated December 29, 2005,

---

[11] Moses Aff. Ex. 14 at 3 (emphasis added).

[12] Am. Compl. ¶ 18.

[13] Am. Compl. ¶ 20; Moses Aff. Ex. 3 at 26.

[14] Am. Compl. ¶ 20.

[15] *See Feuer v. Dauman*, 2017 WL 4817427, at *1 (Del. Ch. Oct. 25, 2017).

which was amended on March 13, 2007 and December 10, 2008 (collectively, the "Employment Agreement").[16] The Employment Agreement provides that Redstone's employment could "be terminated by either party at will."[17]

As amended in March 2007, the Employment Agreement provided that Redstone would receive a base salary of $1 million per year and an annual bonus based on achievement of performance goals established by the Compensation Committee.[18] The Compensation Committee was required to review Redstone's base salary "at least annually" and was permitted to award "merit increases" but was not permitted to decrease Redstone's salary, "including as it may be increased from time to time."[19] In other words, if Redstone's $1 million base salary as March 2007 subsequently was increased, the Compensation Committee did not have the authority to decrease it from that higher amount. In 2010, the Compensation Committee raised Redstone's base salary to $1.75 million.[20]

The Employment Agreement also entitled Redstone to receive cash bonuses in accordance with the Company's Senior Executive Short-Term Incentive Plan (the

---

[16] Am. Compl. ¶ 16.

[17] Am. Compl. ¶ 16.

[18] Moses Aff. Ex. 10 ¶ 1; Ex. 9 at Ex. 10.1 ¶¶ 2(a), (c). The base salary is payable "no less frequently than semi-monthly." Ex. 9 at Ex. 10.1 ¶ 2(a).

[19] Moses Aff. Ex. 10 ¶ 1.

[20] Am. Compl. ¶¶ 50, 72; Moses Aff. Ex. 12 at 44.

6

"STIP").[21]    The STIP required the Compensation Committee to make a determination about which senior executives would be eligible for the program and set performance goals based on financial targets.[22]

## C.    Redstone's Compensation and Performance for 2014

On February 20, 2014, about two months before Redstone would turn 91 years old,[23] the Compensation Committee approved a set of goals for Redstone for 2014 that included being "a sounding-board/counselor to [the] CEO on issues of strategic importance," ensuring that "strategic plans are up-to-date" and "being executed on," providing "effective communications with [the] Board," and assisting "the Board in maintaining best governance practices."[24]   Not long after these goals were set, beginning in the spring of 2014, Redstone suffered from "a precipitous decline in his physical health" according to a complaint in an elder abuse lawsuit filed on Redstone's behalf in 2016 (the "Elder Abuse Complaint").[25]   Redstone's health problems included a bout with pneumonia and multiple hospitalizations.[26]

---

[21] Moses Aff. Ex. 9 at Ex. 10.1 ¶ 2(c)(1); Ex. 4 at 44.

[22] Moses Aff. Ex. 13 at Art. II §§ 2.1-2.2.

[23] Am. Compl. ¶ 36.

[24] Moses Aff. Ex. 21 at 2; Am. Compl. ¶ 52.

[25] Am. Compl. ¶¶ 13, 95.

[26] Am. Compl. ¶¶ 36, 41.

7

On May 22, 2014, Redstone briefly attended CBS's annual stockholders' meeting, where he "called the meeting to order and welcomed the directors to the meeting" after being carried onstage in a chair.[27]  Redstone was not physically present for the July 29, 2014 Board meeting; rather, he called in telephonically.[28] Redstone's verbal participation was limited to saying "Hello Everyone," since, as a contemporaneous email sent to CBS's President and CEO Moonves from a fellow CBS executive explained, "[you] can't understand him!"[29]

By early September 2014, two members of the Board, Moonves and Kopelson, were aware that Redstone had been hospitalized at the end of August with pneumonia.[30]  According to the Elder Abuse Complaint, by this point in time, "Redstone could not eat or drink, it became difficult for Redstone to initiate communication or articulate more than the most basic verbal responses," and he "required around-the-clock nursing care, and any semblance of independence was lost."[31]  Redstone did not physically attend the October 1, 2014 Board meeting, and only said "Hello Everyone" at the beginning of the session.[32]  His participation in

---

[27] Am. Compl. ¶ 38.

[28] Am. Compl. ¶ 40.

[29] Am. Compl. ¶¶ 39-40.

[30] Am. Compl. ¶¶ 41-42.

[31] Am. Compl. ¶ 95 (internal quotations omitted).

[32] Am. Compl. ¶ 44.

the Company's November 5, 2014 quarterly earnings call amounted to Redstone saying "[t]his is Sumner. Welcome to the CBS Corp. event."[33] Redstone telephoned into a Board meeting on December 11, 2014, again only saying "Hello Everyone."[34]

On January 28, 2015, the Compensation Committee and the Nominating and Governance Committee held a joint meeting. According to minutes of the joint meeting, they discussed "the performance of the Executive Chairman . . . with respect to [his] previously established goals for 2014."[35] The minutes indicate that the joint committee reviewed "Mr. Redstone's role as Executive Chairman of the CBS Board of Directors, noting that during this period, the Company had produced exceptional results."[36]

Later on January 28, the Compensation Committee met and discussed the fact that CBS had achieved the 2014 goals for payment of bonus compensation under the STIP.[37] According to minutes of the meeting, the Compensation Committee discussed the "bonus[] to be paid . . . with respect to . . . the Executive Chairman" and "the future participation by Mr. Redstone in the Company's bonus program."[38]

---

[33] Am. Compl. ¶ 47. A participant in a Viacom earnings call a few days later described Redstone's speech as "faint, slurred, barely audible." Am. Compl. ¶ 48.

[34] Am. Compl. ¶ 49.

[35] Moses Aff. Ex. 22 at 2; Am. Compl. ¶ 5(a).

[36] Moses Aff. Ex. 22 at 2.

[37] Am. Compl. ¶¶ 5(b), 51; Moses Aff. Ex. 23 at 1-2.

[38] Moses Aff. Ex. 23 at 3.

The minutes note that the Compensation Committee was advised by an independent compensation consultant, Moonves, and CBS's Chief Human Resources Officer during this meeting.[39] At this January 28, 2015 meeting, the Compensation Committee approved a $9 million bonus for Redstone for 2014.[40]

The following day the Board met.[41] The meeting minutes state that Gifford, as chair of the Compensation Committee, apprised the Board of the prior day's deliberations and the conclusions of the joint committee.[42] All in, CBS paid Redstone $10.75 million of cash compensation for fiscal year 2014, of which $1.75 million was his base salary and $9 million was a performance bonus.[43]

### D. Redstone's Compensation and Performance for 2015

In 2015, Redstone did not participate in any conference calls with Wall Street analysts. He also did not physically attend any Board meetings in 2015, participating instead by phone.[44] The agenda for the January 29, 2015 Board meeting indicates that Redstone greeted the Board; at the other three Board meetings that year Redstone did not speak at all.[45]

---

[39] Moses Aff. Ex. 23 at 1.

[40] Am. Compl. ¶¶ 5(b), 55; Moses Aff. Ex. 23 at 3, 11-12; Ex. 24.

[41] Am. Compl. ¶ 5(c).

[42] Am. Compl. ¶ 5(c).

[43] Am. Compl. ¶ 50.

[44] Am. Compl. ¶ 56.

[45] Am. Compl. ¶¶ 5(i), (j), 56.

At a February 19, 2015 meeting, the Compensation Committee addressed Redstone's compensation for 2015.[46]   The meeting minutes indicate that the Compensation Committee discussed "changes in the goals and objectives from the prior year and the status of the participation of the Executive Chairman in the Company's 2015 bonus program," as well as Redstone's annual base salary.[47]  The Compensation Committee ultimately did not establish goals for Redstone in 2015, determined that he would not receive a bonus that year, and kept his base salary at $1.75 million.[48]  The Board later decided to re-nominate Redstone to be a director.[49]

In the spring of 2015, Redstone's failing health became a subject of tabloid intrigue.  On May 20, 2015, *The Hollywood Reporter* published an article entitled "Sumner Redstone's Two Girlfriends Throwing Him 92nd Birthday 'Passion to Party' Bash Amid Viacom Intrigue."  It reported that Redstone's "health is said to have declined considerably since his last in-person interview, which [*The Hollywood Reporter*] published in January 2014 . . . Now sources say his speech is all but unintelligible."[50]  Leah Bishop, Redstone's estate attorney, acknowledged in the

---

[46] Am. Compl. ¶¶ 5(d), (e).

[47] Am. Compl. ¶¶ 5(d), (e), 54, 57; Moses Aff. Ex. 25 at 5.

[48] Am. Compl. ¶¶ 5(d), (e), (g), 72; Moses Aff. Ex. 25 at 5.

[49] Am. Compl. ¶ 60.

[50] Am. Compl. ¶ 59.

article that Redstone's speech was "severely impaired" and that he "no longer can be understood on the phone."[51]

On May 31, *Vanity Fair* published an article entitled "Who Controls Sumner Redstone?" One person who saw Redstone in person stated in the article: "Sumner (a) cannot speak and (b) hasn't had a meal since Labor Day other than tubes. I think there's a big charade going on that Sumner's doing fine . . . I think he's pretty out of it . . . He can't speak, and I don't know how much he knows what's going on."[52] The article also reported that a person visiting with Robert Evans, one of Redstone's closest friends, said "[h]e [*i.e.*, Redstone] looks like he's dead," to which Evans responded, "[w]ell, you should see him in person—he looks even worse."[53]

In October 2015, two CBS directors, Goldberg and Kopelson, each met separately with Redstone at his home. During these meetings, Redstone was "especially vacant and absent," and "appeared out of touch, remote and non-responsive to the people around him."[54] Scrutiny of Redstone's health further intensified after Manuela Herzer, Redstone's former caretaker, filed a petition in

---

[51] Am. Compl. ¶ 59.

[52] Am. Compl. ¶ 62.

[53] Am. Compl. ¶ 62.

[54] Am. Compl. ¶¶ 66-67.

California state court on November 24, 2015 claiming that Redstone did not have the capacity to revoke her status as his healthcare agent (the "*Herzer* Action").[55]

On December 2, 2015, Moonves received an email from a fellow director stating: "The recent legal actions and continuing questions regarding Sumner Redstone's health create an environment of uncertainty that could distract investors from focusing on the operational performance of the company. We want our shareholders to be totally confident that CBS is being managed and governed at the level they expect."[56]

According to the Amended Complaint, the Compensation Committee decided at its January 27, 2016 meeting that Redstone "would not receive a bonus for fiscal year 2015" but "approved the continued contractual salary compensation payable to" Redstone of $1.75 million for 2016.[57] The only reference to Redstone's compensation in the minutes of that meeting, by contrast, states simply that "the Committee noted that the Executive Chairman would not be receiving a bonus for

---

[55] Am. Compl. ¶¶ 7-8.

[56] Am. Compl. ¶ 70. The Amended Complaint states that the email was sent from "Bruce Goldberg," which appears to be a mistake, as that name is a combination of the names of two different CBS directors: Leonard Goldberg and Bruce Gordon. I infer that the email came from one of these two directors.

[57] Am. Compl. ¶¶ 72-73.

2015."[58] Two days later, Redstone was present telephonically for the Board meeting but did not speak at all.[59]

### E. Redstone Becomes Chairman Emeritus of CBS

In early February 2016, the California court in the *Herzer* Action ordered an examination of Redstone by a geriatric psychiatrist.[60] According to an article in *The New York Times*, the geriatric psychiatrist "found that [Redstone] lacked mental capacity."[61]

On February 2, 2016, Redstone tendered his resignation as Executive Chairman of CBS.[62] The next day, on February 3, the Board held a special meeting and discussed Redstone's resignation.[63] Redstone attended this meeting by telephone but did not speak.[64] The Board accepted his resignation and unanimously appointed Redstone as Chairman Emeritus.[65] According to a Board resolution adopted on February 3, 2016, the appointment was made "in view of [Redstone's] many years of leadership as Executive Chairman and his significant historical

---

[58] Moses Aff. Ex. 26 at 3-4.

[59] Am. Compl. ¶ 76.

[60] Am. Compl. ¶ 77.

[61] Am. Compl. ¶ 77.

[62] Am. Compl. ¶ 5(n).

[63] Am. Compl. ¶¶ 5(m), 79.

[64] Am. Compl. ¶ 79.

[65] Am. Compl. ¶¶ 5(n), 80; Moses Aff. Ex. 27 at 1-3.

contributions to the Company."[66] Minutes of a February 3, 2016 Board meeting reflect that Redstone "indicated that he would continue to be available for consultation and to attend Board meetings."[67]

On February 18, 2016, the Compensation Committee considered Redstone's compensation as Chairman Emeritus.[68] Minutes of the meeting state that the Compensation Committee took "into account his reduction in responsibilities following his resignation as the Company's Executive Chairman on February 2, and his continuing employment with the Company as an at-will employee."[69] The minutes also state that the Compensation Committee discussed Redstone's "significant historical contributions to the Company during his previous executive positions with the Company, including his status as a renowned leader in the entertainment industry and his leadership on the Company's Board of Directors, and his continuing availability for advice and consultation and continuing participation on the CBS Board of Directors as Chairman Emeritus."[70] The Compensation

---

[66] Moses Aff. Ex. 27 at 3.

[67] Moses Aff. Ex. 27 at 1.

[68] Am. Compl. ¶ 5(n).

[69] Am. Compl. ¶ 5(n).

[70] Am. Compl. ¶ 5(n).

15

Committee approved annual compensation of $1 million for Redstone in his role as Chairman Emeritus.[71] In this role, Redstone was not eligible for a bonus.[72]

On April 15, 2016, the Company disclosed in a proxy statement that the Board had nominated Redstone for re-election as a director.[73]

On May 9, 2016, the *Herzer* Action was dismissed when the California court determined that Redstone "was sufficiently competent to terminate Ms. Herzer as his caretaker."[74] The California court reasoned that "Redstone is presumed to have capacity and Herzer's expert did not establish that he lacked capacity to change his agent."[75] The court also emphasized that it was "*not* making any ultimate finding related to Redstone's mental capacity."[76]

On May 20, 2016, Philippe Dauman (the CEO and a director of Viacom) and George Abrams (a Viacom director) were informed that Redstone had removed them as trustees of the Sumner Redstone National Amusements Trust and as directors of National Amusements, Inc., the entities through which Redstone maintains his controlling interest in CBS.[77] In response, Dauman and Abrams filed a lawsuit in

---

[71] Am. Compl. ¶ 83.

[72] Moses Aff. Ex. 19.

[73] Am. Compl. ¶ 81.

[74] Am. Compl. ¶¶ 8, 84; Moses Aff. Ex. 17 at 1.

[75] Moses Aff. Ex. 17 at 17.

[76] *Id.* at 11 (emphasis in original).

[77] Am. Compl. ¶¶ 89-90.

Massachusetts state court, seeking to be reinstated.[78] Relevant to this action, Dauman and Abrams alleged in their complaint that Redstone:

> suffers from profound physical and mental illness. In particular, he is afflicted with a "subcortical neurological disorder" that can be characterized by dementia, impaired cognition, a slowness of mental processing, a loss of memory, apathy, and depression. Because of his diminished physical and mental health, Mr. Redstone is unable to initiate or participate in meaningful conversation, including communications concerning his business or personal affairs. In court proceedings earlier this year, lawyers representing Mr. Redstone appear to have agreed [that] Mr. Redstone is subject to mental impairment and stipulated that he is susceptible to undue influence.[79]

Redstone did not attend CBS's annual stockholders meeting on May 26, 2016.[80] On June 14, 2016, Redstone was taken by car to visit CBS, where he met with Moonves for approximately ten minutes but did not leave the car.[81]

On October 25, 2016, the Elder Abuse Complaint was filed on Redstone's behalf against Herzer and other defendants, alleging elder abuse, breach of fiduciary duty, constructive fraud, and intentional infliction of emotional distress.[82] Among other things, the Elder Abuse Complaint describes Redstone's extreme decline in health since the spring of 2014, his inability to communicate orally, his complete

---

[78] Am. Compl. ¶ 91.

[79] Am. Compl. ¶ 91.

[80] Am. Compl. ¶ 86.

[81] Am. Compl. ¶ 93.

[82] Am. Compl. Ex. B.

17

reliance on nursing care, and a mental state where he was "easily duped, confused and manipulated."[83]

The Board did not nominate Redstone for re-election as a director at CBS's May 19, 2017 annual meeting.[84] It appears that Redstone continues to hold the title of Chairman Emeritus,[85] but it is unclear from the record how much compensation he has received from the Company since the Compensation Committee set his salary for that position in February 2016 at $1 million annually.

## II.    PROCEDURAL HISTORY

On March 29, 2016, plaintiff made a Section 220 demand on CBS.[86] On July 20, 2016, plaintiff filed this action derivatively on behalf of CBS. Plaintiff did not make a pre-suit demand on the Board, alleging that demand would be futile.

On January 19, 2017, after defendants filed a motion to dismiss the original complaint, plaintiff filed the Amended Complaint, which asserts two claims. Count I asserts a claim for breach of fiduciary duty for waste of corporate assets against all the individual defendants, except Redstone, with respect to the compensation he

---

[83] Am. Compl. ¶ 95.

[84] Moses Aff. Ex. 35 at 3.

[85] *Sumner M. Redstone*, CBS CORP., https://www.cbscorporation.com/people/sumner-m-redstone/ (last visited Apr. 18, 2018).

[86] Am. Compl. ¶ 2 & Ex. A.

18

received from CBS during the Relevant Period. Count II asserts that Redstone was unjustly enriched by the receipt of this compensation.

On February 2, 2017, defendants filed a motion to dismiss the Amended Complaint under Court of Chancery Rules 23.1 and 12(b)(6) for failure to plead demand futility and failure to state a claim upon which relief may be granted, respectively. After initial briefing, the court heard oral argument on the motion to dismiss on September 15, 2017. On December 22, 2017, the court requested supplemental briefing concerning who (*i.e.*, the Compensation Committee or the Board) was empowered to terminate the Employment Agreement, and the legal implications of the answer to that question on the pending motion. Briefing on this issue was completed on January 16, 2018.

## III. ANALYSIS

Plaintiff challenges three categories of cash payments that CBS made to Redstone during the Relevant Period, namely the payment of (1) a $9 million bonus for 2014, (2) his annual base salary of $1.75 million as Executive Chairman from late May 2014 until his resignation from this position in February 2016, and (3) his annual base salary of $1 million as Chairman Emeritus beginning in February 2016.[87] These categories are depicted in the chart below:

---

[87] Am. Compl. ¶¶ 50, 72, 83.

| Year | Primary Role | Base Salary | Bonus | Total |
|---|---|---|---|---|
| 2014 | Executive Chairman | $1.75 million | $9.00 million | **$10.75 million** |
| 2015 | Executive Chairman | $1.75 million | -- | **$1.75 million** |
| 2016 | Chairman Emeritus | $1.00 million | -- | **$1.00 million** |
| **Total:** | | **$4.50 million** | **$9.00 million** | **$13.50 million** |

I first consider defendants' motion to dismiss under Rule 23.1 for failure to make a pre-suit demand on the Board, and then turn to defendants' motion to dismiss under Rule 12(b)(6) for failure to state a claim.

## A. The Demand Requirement

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[88] Accordingly, stockholders may not prosecute a claim derivatively on behalf of a corporation unless they "either (1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile."[89] Making a pre-suit demand

---

[88] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[89] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citing *Stone v. Ritter*, 911 A.2d 362, 366-67 (Del. 2006)).

is futile when the directors upon whom the demand would be made "are incapable of making an impartial decision regarding such litigation."[90]

Because plaintiff did not make a demand on the Board before initiating this action, he must allege with particularity that his failure to make such a demand should be excused.[91]  In this analysis, I accept as true plaintiff's particularized allegations of fact and draw all reasonable inferences that logically flow from those allegations in plaintiff's favor.

Under Delaware law, depending on the factual scenario, there are two different tests for determining whether demand may be excused:  the *Aronson* test and the *Rales* test.[92]  The test articulated in *Aronson v. Lewis*[93] applies when "a *decision* of the board of directors is being challenged in the derivative suit."[94]  The test set forth in *Rales v. Blasband*, on the other hand, governs when "the board that would be considering the demand did not make a business decision which is being

---

[90] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[91] Ct. Ch. R. 23.1.

[92] Both tests boil down to the same inquiry:  whether "the derivative plaintiff has shown some good reason to doubt that the board will exercise its discretion impartially and in good faith."  *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007).

[93] 473 A.2d 805.

[94] *Rales*, 634 A.2d at 933 (emphasis in original).

challenged in the derivative suit," such as instances "where directors are sued derivatively because they have failed to do something."[95]

"A decision approved by at least half of the corporation's directors who would consider a demand, even when acting by committee, can be imputed to the entire board and thus triggers the *Aronson* test. . . . By contrast, the *Rales* test applies where a derivative plaintiff challenges a decision approved by a board committee consisting of less than half of the directors who would have considered a demand, had one been made."[96] Under either test, plaintiff "must impugn the ability of at least half the directors in office when it initiated [its] action . . . to have considered a demand impartially."[97]

## B. Demand Futility is Governed by the *Rales* Test

Plaintiff's breach of fiduciary duty and unjust enrichment claims are governed by *Rales*. The Amended Complaint and the materials it incorporates by reference show that Redstone's compensation during the Relevant Period was determined by the Employment Agreement and the four-member Compensation Committee. More specifically, Redstone's $1.75 million base salary for 2014 and 2015 was set by the terms of the Employment Agreement entered into before the Relevant Period and

---

[95] *Id*. at 933-34 & n.9.

[96] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 56-57 (Del. Ch. 2015) (citations omitted).

[97] *Id*. at 57 (citation omitted).

could only be reduced by terminating the Employment Agreement, which did not occur until Redstone resigned in February 2016. Thus, any challenge to these payments is based on *inaction* and subject to *Rales*.[98] Challenges to Redstone's $9 million bonus in 2014 and the setting of his $1 million annual salary in 2016 as Chairman Emeritus also are analyzed under *Rales* because they were decisions made by the four-member Compensation Committee, which comprised a minority of the full thirteen-member Board.

Plaintiff argues that the *Aronson* test should apply because a majority of the directors *reviewed* Redstone's performance and "the full CBS board *was aware* that Sumner was incapacitated and essentially went along with the decision purportedly made by" the majority of directors regarding Redstone's compensation.[99] I disagree for two reasons. First, reviewing performance is distinct from setting specific amounts to be paid. It is indisputable that the four-member Compensation Committee, which had the fully-delegated authority to set the level of Redstone's compensation under its charter, made the decisions establishing the amount of

---

[98] *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *6 (Del. Ch. Oct. 12, 2011).

[99] Pl.'s Answering Br. 24, 26 (emphasis added) (Dkt. 65). According to plaintiff, "two committees (comprised of 6 directors), along with defendant Moonves" made the compensation decisions. *Id*. at 26. This assertion is incorrect because the Compensation Committee's charter clearly states that the Compensation Committee is vested with the full authority to "set the compensation level[] of the Chairman." Moses Aff. Ex. 14 at 3.

23

Redstone's bonus and his salary as Chairman Emeritus.[100]  Plaintiff does not dispute this point.[101]  Second, the fact that the Board and the Nominating and Governance Committee were *aware* of the Compensation Committee's considerations in setting Redstone's compensation does not mean that the Nominating and Governance Committee affirmatively *made the decision* to pay Redstone those amounts.[102]

## C.    Demand is Partially Excused under the *Rales* Test

Under *Rales*, plaintiff's claims should be dismissed under Rule 23.1 unless the particularized allegations of the Amended Complaint "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[103]  The demand futility analysis "is conducted on a claim-by-claim basis" under Delaware law.[104]  "Independence means that a director's decision is based on

---

[100] *See Calma v. Templeton*, 2015 WL 1951930, at *6 (Del. Ch. Apr. 30, 2015) (holding that *Rales* applied where a dully authorized compensation committee, and not the entire board, approved a restricted stock grant).

[101] Tr. 51 (Sept. 15, 2017) ("Q: Do you agree that the four members of the compensation committee had plenary authority to make each of the decisions that you're challenging . . . ?  A: I think that's supported by the organic documents that were produced in response to the 220 and, in particular, the compensation committee charter.").

[102] *See Baiera*, 119 A.3d at 57 ("The inference of full board approval . . . amounts to little more than speculation.").

[103] 634 A.2d at 934.

[104] *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014) (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004); *Needham v. Cruver*, 1993 WL 179336, at *3 (Del. Ch. May 12, 1993)).

24

the corporate merits of the subject before the board rather than extraneous considerations or influences."[105] "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders."[106] Accordingly, a director can be rendered "interested" with respect to whether litigation should be brought when the director would face a substantial threat of personal liability.[107]

Here, it bears emphasis that plaintiff has not argued that any of the directors were not independent.[108] Plaintiff instead contends only that the Board was not "disinterested" because its members face a substantial threat of personal liability on the theory that the decision to continue paying Redstone throughout the Relevant Period "simply cannot be a decision made in good faith and constitutes waste."[109] Consistent with the approach of analyzing demand futility claim-by-claim, I address below the alleged threat of personal liability to the directors arising from plaintiff's

---

[105] *Aronson*, 473 A.2d at 816.

[106] *Rales*, 634 A.2d at 936 (citation omitted).

[107] *Kohls v. Duthie*, 791 A.2d 772, 782 (Del. Ch. 2000).

[108] *See* Tr. 52 (Sept. 15, 2017); *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[109] Pl.'s Answering Br. 31.

claims related to three challenged categories of cash payments to Redstone: (1) the $9 million bonus paid for 2014, (2) the Executive Chairman salary ($1.75 million annually) paid from late May 2014 until Redstone resigned from that position in February 2016, and (3) the Chairman Emeritus salary ($1 million annually) beginning in February 2016. I begin with a brief discussion of the legal standards for bad faith and waste.

### 1. Legal Standards for Bad Faith and Waste

As general matter, "bad faith will be found if a fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties,"[110] or if "the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other ground other than bad faith."[111] "Good faith is presumed and the party challenging director action bears the burden of rebutting that presumption."[112] "The proper inquiry is not whether a director neglected to do all that [he] should have . . . but rather whether the director knowingly and completely failed to undertake [his] responsibilities."[113]

---

[110] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (citation and internal quotations omitted).

[111] *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000) (citation and internal quotations omitted).

[112] *McGowan v. Ferro*, 859 A.2d 1012, 1036 (Del. Ch. 2004) (citation omitted).

[113] *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *13 (Del. Ch. Sept. 30, 2013) (citation and internal quotations omitted).

"The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith."[114] In order to make out a waste claim, a plaintiff needs to show that the corporation has entered into a transaction in which it received consideration "so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid."[115] In the context of employee compensation, courts afford great deference to a board's decision,[116] since "[t]he decision as to how much compensation is appropriate . . . is a core function of a board of directors"[117] and "[c]ourts are ill-fitted to attempt to weigh the 'adequacy' of consideration."[118]

As the above formulations demonstrate, the "standards for corporate waste and bad faith by the board are similar" in that, to prevail on either theory, "the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on

---

[114] *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) (citing *White v. Panic*, 783 A.2d 543, 553-55 (Del. 2001)).

[115] *Grobow v. Perot*, 539 A.2d 180, 189 (Del. 1988) (quoting *Saxe v. Brady*, 184 A.2d 602, 610 (Del. Ch. 1962)), *overruled on other grounds by Brehm*, 746 A.2d 244.

[116] *See Brehm*, 746 A.2d at 263 ("[A] board's decision on executive compensation is entitled to great deference.").

[117] *In re Goldman Sachs*, 2011 WL 4826104, at *14.

[118] *Brehm*, 746 A.2d at 263 (citation omitted).

a valid assessment of the corporation's best interests."[119]  In short, it takes an extreme factual scenario for a plaintiff to state a claim for bad faith or waste.

### 2. The 2014 Bonus

"The Delaware General Corporation Law (DGCL) expressly empowers a board of directors to appoint committees and to delegate to them a broad range of responsibilities, which may include setting executive compensation."[120]  When a committee, rather than the board of directors, has plenary power to fix an executive's compensation, then it is the committee that legally determines the amounts to be paid to that executive.[121]

At CBS, the responsibility for setting Redstone's compensation as Executive Chairman of the Company during the Relevant Period validly and solely laid with the four-member Compensation Committee.  As mentioned above, the Compensation Committee's charter provides that its "primary purpose . . . is to discharge the responsibilities of the Board relating to the compensation of the Company's executive officers and other senior executives" and expressly states that

---

[119] *White*, 783 A.2d at 554 n.36 (citation omitted).

[120] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 54 (Del. 2006) (citing 8 *Del. C.* § 141(c)).

[121] *Id.*

the Compensation Committee "shall set the compensation level[] of the Chairman."[122]

At the beginning of 2014, before Redstone allegedly became incapacitated in late May 2014, the Compensation Committee decided to include Redstone in the bonus pool for 2014 and set the 2014 performance criteria that CBS would have to achieve in order for Redstone to be entitled to a bonus.[123] After the Company reportedly achieved its performance goals, the Compensation Committee awarded Redstone a $9 million bonus.[124]

Relevant to the demand futility analysis, the decision to award this $9 million bonus was an exercise of discretion made solely by the four members of the Compensation Committee. This means that, putting the members of the Compensation Committee and Redstone aside, eight members of the thirteen-member Board did not participate in making the decision to award the $9 million bonus and thus would not face a substantial threat of personal liability for that decision. Accordingly, because these eight directors constitute a majority of the Board and their independence is not questioned, demand on the Board is not excused

[122] Moses Aff. Ex. 14 at 1, 3.

[123] Moses Aff. Ex. 20 at 10.

[124] Am. Compl. ¶¶ 5(b), 55; Moses Aff. Ex. 23 at 3, 11-12; Ex. 24.

with respect to plaintiff's breach of fiduciary duty claim challenging Redstone's 2014 bonus.

### 3. The Executive Chairman Salary Payments

Unlike the 2014 bonus, payment of Redstone's $1.75 million annual salary as Executive Chairman from the end of May 2014, when he allegedly became incapacitated, through early February 2016, when he resigned as Executive Chairman, was not the product of an affirmative decision of the Compensation Committee. Rather, the salary compensation Redstone received during this period was set by default in the Employment Agreement that was entered into before the Relevant Period. As discussed above, under the Employment Agreement, the Compensation Committee could only increase, and not decrease, Redstone's salary, which was set at $1.75 million annually in 2010. Thus, the only way for CBS to reduce or eliminate this annual salary obligation would have been for the Company to terminate the Employment Agreement, which could be "terminated by either party at will upon receipt of notice to the other party."[125]

The parties disagree whether the Board alone, or also the Compensation Committee, was empowered to terminate the Employment Agreement. Plaintiff argues that the Board alone had this authority. Defendants, on the other hand, argue that the Compensation Committee was empowered to terminate the Employment

---

[125] Moses Aff. Ex. 9 at Ex. 10.1 ¶ 9.

Agreement "without further Board approval" pursuant to the authority delegated to it under its charter, but they concede that the "Board could also have terminated the agreement pursuant to its inherent ability to manage and direct the affairs of the Company."[126]

I need not decide whether the Board alone had the authority to terminate the Employment Agreement because, as defendants acknowledge, the Board retained the concurrent power to do so.[127] Thus, it would not be appropriate to limit my inquiry solely to the members of the Compensation Committee when considering which directors potentially face a substantial threat of personal liability for failing to terminate, or failing to at least consider terminating, the Employment Agreement. Put differently, given the full Board's conceded inherent ability to terminate the Employment Agreement, all of its members could face a sufficiently substantial threat of liability if it would have been wasteful or an act of bad faith not to at least consider doing so.

A central tenant of our corporate law is that the "business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors."[128]

---

[126] Defs.' Suppl. Br. 1 (Dkt. 86).

[127] Indeed, before the court asked for supplemental briefing concerning whether the Compensation Committee or the Board was empowered to terminate the Employment Agreement, it was defendants' position that this was "a decision rightly left to the judgment of the Board." Defs.' Opening Br. 43 (Dkt. 55).

[128] 8 *Del. C.* § 141(a).

To be sure, directors may—and must as a practical matter for a large public corporation—delegate day-to-day decision-making to officers.[129] Critically though, these "delegations 'must be monitored in order to ensure their quality and integrity.'"[130]

Here, as one would expect for a corporate executive receiving millions of dollars of compensation, Redstone's Employment Agreement expressly required him to "*be actively engaged*" in performing certain specified duties:

> Without limiting the foregoing, you [Redstone] will be actively engaged in, and have responsibility, working with the Board and the President and [CEO] of CBS, [] for (a) the overall leadership and strategic direction of CBS, (b) providing guidance and support to senior management of CBS, (c) the coordination of the activities of the Board and (d) communication with shareholders and other important constituencies.[131]

Contrary to the terms of the Employment Agreement quoted above, the Amended Complaint alleges numerous facts demonstrating that it should have been abundantly clear to the members of the Board—from their attendance at Board meetings, press publicity, and other interactions with the Company—that far from being "actively

---

[129] 8 *Del. C.* § 142.

[130] 1 STEPHEN A. RADIN, THE BUSINESS JUDGMENT RULE 444 (6th ed. 2009) (quoting William B. Chandler III, *The Legal Framework for Analyzing Audit Committee Oversight*, CORP. GOVERNANCE ADVISOR 18 (Jan./Feb. 2000)).

[131] Moses Aff. Ex. 9 at Ex. 10.1 ¶ 1.

engaged" in the CBS's affairs, Redstone was providing no meaningful services to the Company beginning at some point in the latter part of 2014 or in 2015:

- On May 22, 2014, after being carried onstage in a chair, Redstone only briefly attended the annual stockholders meeting to call it to order.[132]

- Beginning with the July 29, 2014 Board meeting, Redstone, who usually attended Board meetings in person, never physically attended another Board meeting.[133]

- Redstone's participation in the July 29, 2014 Board meeting, the October 1, 2014 Board meeting, the November 5, 2014 quarterly earnings call, the December 11, 2014 Board meeting, and the January 29, 2015 Board meeting consisted of little more than introducing himself. He made no substantive contribution.[134]

- Redstone did not participate in any conference calls with Wall Street analysts in 2015, and he did not speak at all at any of the other Board meetings held in 2015—on March 31, May 21, October 2, and December 10.[135]

- On May 20, 2015, *The Hollywood Reporter* published an article reporting that Redstone was severely impaired.[136]

- On May 31, 2015, *Vanity Fair* published a similar article.[137]

- On November 24, 2015 the *Herzer* Action was filed.[138]

---

[132] Am. Compl. ¶ 38.

[133] Am. Compl. ¶¶ 40, 44, 49, 56.

[134] Am. Compl. ¶¶ 40, 44, 47, 49, 56.

[135] Am. Compl. ¶ 56.

[136] Am. Compl. ¶ 59.

[137] Am. Compl. ¶ 62.

[138] Am. Compl. ¶¶ 7-8.

33

The Amended Complaint also sets forth individualized allegations as to several CBS directors—namely Moonves, Kopelson, and Goldberg—indicating that they knew about Redstone's inability to contribute to CBS in any meaningful sense:

- On July 14, 2014, Moonves received an email from a CBS executive alerting him that Redstone's speech was incomprehensible.[139]

- By early September 2014, Moonves and Kopelson (as well as several CBS executives) knew that Redstone had been hospitalized at the end of August 2014 with pneumonia.[140]

- On November 3, 2014, Kopelson sent Moonves an email stating: "Hard to tell if he is worse. Barely communicates and then is totally unintelligible. Had coughing fit Saturday night and Sydney took him into the hospital just to check him out and then home."[141]

- In October 2015, Goldberg and Kopelson met with Redstone at his home, during which Redstone was "especially vacant and absent" and "appeared out of touch, remote and non-responsive to the people around him."[142]

- On December 2, 2015, Moonves received an email from a fellow CBS director expressing concern about distractions caused by legal actions and questions regarding Redstone's health.[143]

---

[139] Am. Compl. ¶ 39.

[140] Am. Compl. ¶¶ 41-42.

[141] Am. Compl. ¶ 45.

[142] Am. Compl. ¶¶ 66-67.

[143] Am. Compl. ¶ 70.

One logically would expect, and thus it would reasonable to infer, that these reports and observations about Redstone's condition would have been reported back to the other members of the Board.[144]

Viewing these and the other alleged facts in the light most favorable to plaintiff, as the court must at this stage of the case, the Amended Complaint describes with particularity a situation where the members of the Board face a substantial threat of liability for non-exculpated claims for waste and/or bad faith because: (1) Redstone's contributions to the Company after May 2014 were so negligible and inadequate in value that no person of ordinary, sound business judgment would deem them worth the millions of dollars in salary that the Company was paying him; and (2) the failure to inquire into Redstone's health or to at least *consider* terminating his Employment Agreement while the Company paid him millions of dollars over a twenty-month period is reflective of a conscious disregard of the directors' fiduciary duties.

To be clear, the Board certainly did not need to terminate Redstone's employment immediately upon him falling ill. Redstone has been a leading and

---

[144] *See* J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 BUS. LAW. 33, 45 (2014) (citing *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009) ("The failure by an officer or director to provide information regarding the corporation to the board, or a group of directors who direct that information not be furnished to one or more directors, may constitute a breach of fiduciary duty on the part of the officers or directors responsible for the failure.").

prominent figure in the entertainment industry for decades, before and after CBS became an independent public company. He was entitled to be treated in a dignified and respectful manner upon falling ill, as one would hope the Company would treat any of its employees. According to the allegations of the Amended Complaint, however, the Company made no effort to reckon with the financial consequences of Redstone's severe incapacity for approximately *twenty months.* If plaintiff's allegations are true, the Board's extended period of inaction is inexplicable.

Focusing on the decline in Redstone's compensation "from $11.76 million in 2013 to $1 million in 2016," defendants argue that "[t]here is simply no logical inference . . . that Mr. Redstone's capabilities and health issues were ignored."[145] Perhaps discovery will bear out that these concerns actually were addressed as defendants imply, but the record currently before the court does not. To the contrary, there is no indication in plaintiff's pleading, or in the many documents defendants chose to place in the record from the Section 220 production to plaintiff, that Redstone's mental or physical capacity or his ability to perform any substantive tasks was discussed in any meaningful sense during the Relevant Period.[146] Glaringly

---

[145] Defs.' Reply Br. 30 (Dkt. 68).

[146] For example, CBS's Board and Compensation Committee minutes in the latter part of 2014 and throughout 2015 contain no discussion of Redstone's mental or physical capacity. *See* Moses Aff. Exs. 20, 22-34. Defendants argue that "there is no requirement under Delaware law that board minutes adopt any level of particularity." Defs.' Reply Br. 30. True enough, but at this stage of the litigation all reasonable inferences must be drawn in favor of plaintiff.

absent, for example, is any memorandum or other writing candidly assessing Redstone's capabilities and the pros and cons of terminating his Employment Agreement.[147]

In sum, based on the particularized allegations of the Amended Complaint and the procedural posture of the pending motion, the court has good reason to doubt the ability of the Company's directors to investigate impartially claims against themselves concerning the salary payments made to Redstone as Executive Chairman after late May 2014. Accordingly, demand is excused with respect to that part of Count I of the Amended Complaint.

### 4. The Chairman Emeritus Salary Payments

On February 3, 2016, the day after Redstone resigned as Executive Chairman, the Board appointed him as Chairman Emeritus.[148] About two weeks later, on February 18, the Compensation Committee decided to pay Redstone an annual salary

---

[147] Pointing to the Company's proxy statement, defendants assert that if Redstone's employment had been terminated due to disability, the vesting of approximately $3.2 million in equity awards would be accelerated. Defs.' Opening Br. 13; Defs.' Reply Br. 21; Tr. 25 (Sept. 15, 2017). That certainly would be a valid consideration for the Board to take into account in deciding upon a course of action. The problem at this procedural stage, however, is that there is no indication in the record (including the documents that defendants submitted with their papers) that this factor actually was considered in real time. Tr. 25-26 (Sept. 15, 2017).

[148] Am. Compl. ¶¶ 20, 80; Moses Aff. Ex. 27.

of $1 million for "his continuing employment with the Company as an at-will employee following [his] resignation."[149]

The setting of Redstone's compensation as Chairman Emeritus was a Compensation Committee decision, like the setting of the bonus payment in 2014. Nevertheless, it would be unreasonable in my view to expect that the other members of the Board would be able to consider a demand regarding this decision impartially.[150] Practically speaking, it would be against the personal interests of those directors to be critical of a decision to pay Redstone an annual salary of $1 million given that plaintiff's claims regarding the base salary payments made to Redstone as Executive Chairman after May 2014 (before he became Chairman Emeritus in February 2016) will proceed against them.

Put differently, how could a director realistically be expected to criticize a subsequent decision to pay a $1 million annual salary when that director is already being sued for permitting prior annual salary payments to have been made to that same, allegedly incompetent person? This concern about impartiality is particularly

---

[149] Am. Compl. ¶¶ 5(n) (quoting minutes of Feb. 18, 2016 Compensation Committee meeting (Moses Aff. Ex. 28 at 5)), 83.

[150] One might question the non-Compensation Committee directors' ability to be impartial with respect to the 2014 bonus payment for the same reason, but that one-time decision was qualitatively different. It is not contested that the Company met its performance goals for 2014 and that Redstone was able to perform his duties for approximately five months in 2014, which by itself may be sufficient consideration for the bonus. *See* Tr. 47, 65 (Sept. 15, 2017).

acute here, where there is no indication from the allegations of the Amended Complaint that Redstone's mental or physical capacity had improved in early 2016 relative to the latter half of 2014 through 2015. Accordingly, demand is excused with respect to the claims regarding Redstone's compensation as Chairman Emeritus.

### 5. Demand is Excused for Part of the Unjust Enrichment Claim

Count II of the Amended Complaint asserts that Redstone was unjustly enriched through his receipt of cash compensation during the Relevant Period. This claim parallels plaintiff's breach of fiduciary duty claim in Count I, turning on the same challenged payments.[151]

For the reasons explained above, plaintiff has pled no particularized facts excusing his failure to make a demand on the Board with respect to the 2014 bonus payment. This holds true whether the theory of recovery for that payment is based on an alleged breach of fiduciary duty or unjust enrichment. The Board, however, could not impartially consider unjust enrichment claims with respect to the Executive Chairman and Chairman Emeritus base salary payments, since, as explained above, twelve of its thirteen members face a sufficiently substantial threat

---

[151] *See Seinfeld v. Slager*, 2012 WL 2501105, at *16 (Del. Ch. June 29, 2012) (dismissing unjust enrichment claims that were "derivative of" other claims, including waste claims, that were dismissed for failure to demonstrate that demand on the board was excused).

of personal liability for breach of fiduciary duty by permitting those payments to be made. Accordingly, demand with respect to that aspect of Count II is excused.

## D. The Amended Complaint States Claims for Breach of Fiduciary Duty and Unjust Enrichment

In this section, I address whether plaintiff has stated a claim for relief with respect to the claims for which demand is excused, *i.e.*, the breach of fiduciary duty and unjust enrichment claims concerning the Executive Chairman and Chairman Emeritus salaries paid to Redstone after late May 2014. The standards governing a motion to dismiss for failure to state a claim for relief under Court of Chancery Rule 12(b)(6) are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[152]

### 1. The Executive Chairman Salary Payments

"The standard for pleading demand futility under Rule 23.1 is more stringent than the standard under Rule 12(b)(6), and a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim."[153]

---

[152] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations and internal quotations omitted).

[153] *Citigroup*, 964 A.2d at 139 (citation and internal quotations omitted).

40

Accordingly, for the same reasons stated in the demand futility analysis, plaintiff has stated a claim with respect to the payment of the Executive Chairman salary from the latter half of 2014 until Redstone's resignation from that position in February 2016. To briefly reiterate, plaintiff sufficiently has alleged well-pled facts demonstrating that Redstone's contributions over that time period were so disproportionately small that continued payment of the Executive Chairman salary ($1.75 million annually) was a decision beyond the range of what any reasonable person might be willing to trade for such "services."

## 2. The Chairman Emeritus Salary Payments

Plaintiff also has stated a claim for breach of fiduciary duty with respect to the Chairman Emeritus salary payments. The Company explicitly stated that it appointed Redstone as Chairman Emeritus and decided to pay him an annual salary of $1 million with the expectation that Redstone would continue to contribute to CBS. In particular, the minutes of the Compensation Committee's February 18, 2016 meeting state that it set Redstone's salary in consideration of his "continuing employment with the Company as an at-will employee," and that Redstone's "continuing availability for advice and consultation and continuing participation on the CBS Board of Directors as Chairman Emeritus" was a factor in making this

41

decision.[154] But, as discussed above, plaintiff has alleged facts that the Board knew that Redstone would not be able to contribute anything of value to CBS by this time, and had known so for a while.

The Compensation Committee minutes reflect that Redstone's "significant historical contributions to the Company" also was discussed when determining the Chairman Emeritus salary.[155] The Company similarly recited in a proxy statement that "[t]he Board believes that that appointment of Mr. Redstone as Chairman Emeritus is appropriate, in view of his many years of leadership as Executive Chairman of the Board and his significant historical contributions to the Company."[156] Relying on these references, defendants defend the Chairman Emeritus salary awarded to Redstone based on this court's dismissal of waste claims involving the payment of compensation for past services rendered.

In each of those cases, however, the payments made were one-time events, typically as part of a severance or retirement arrangement.[157] Here, by contrast, the

---

[154] Am. Compl. ¶ 5(n) (quoting minutes of Feb. 18, 2016 Compensation Committee meeting (Moses Aff. Ex. 28 at 5)); *see also* Moses Aff. Ex. 28 at Ex. K (approving the $1 million Chairman Emeritus salary "with respect to the continuing at-will employment arrangement with Mr. Sumner M. Redstone").

[155] Am. Compl. ¶ 5(n) (quoting minutes of Feb. 18, 2016 Compensation Committee meeting (Moses Aff. Ex. 28 at 5)).

[156] Moses Aff. Ex. 3 at 8.

[157] *See Seinfeld*, 2012 WL 2501105, at *7 (dismissing waste claim with respect to a $1.8 million retirement bonus paid for past services rendered); *Zucker v. Andreessen*, 2012 WL 2366448, at *10 (Del. Ch. June 21, 2012) (dismissing waste claim with respect to a

42

Board did not purport to make only a single payment to Redstone for past contributions as part of a plan of separation. Rather, the Company chose to continue to pay him an annual salary in "exchange" for services it allegedly knew that he could not render. The decision to award an apparently ongoing salary of this size under the circumstances was "sufficiently unusual to require the court to refer to evidence before making an adjudication of [its] validity and consistency with fiduciary duty."[158] Accordingly, this aspect of Count I also states a claim for relief.

### 3. Unjust Enrichment

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[159] "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[160] "When the complaint alleges an express, enforceable contract

---

severance package); *Zupnick v. Goizueta*, 698 A.2d 384, 388-89 (Del. Ch. 1997) (dismissing waste claim with respect to a stock option award granted for past services rendered where the options became exercisable immediately upon the executive's retirement and the executive was eligible to retire when the options were granted).

[158] *Lewis v. Vogelstein*, 699 A.2d 327, 339 (Del. Ch. 1997) (Allen, C.).

[159] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (citation and internal quotations omitted).

[160] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citation omitted).

that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed."[161]

Because Redstone's base salary compensation as Executive Chairman was governed by the Employment Agreement, plaintiff has not stated a claim for unjust enrichment with respect to those payments. It is not alleged, however, that Redstone ever signed a new employment contract in connection with his appointment as Chairman Emeritus after his resignation as Executive Chairman.[162] With respect to these payments, Redstone only implicitly challenges the fourth element, *i.e.*, the absence of justification:

> To the extent the Complaint seeks to challenge the compensation paid to Mr. Redstone following his resignation as Executive Chairman and appointment as Chairman Emeritus, it nonetheless fails to state a claim because . . . there was no underlying wrongful conduct by the Individual Defendants in awarding that compensation to Mr. Redstone.[163]

I disagree. For the reasons explained above, plaintiff has adequately pleaded that the Chairman Emeritus payments made to Redstone were wasteful and thus lacked justification. Accordingly, at this stage of the case, the court cannot conclude that

---

[161] *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006) (citation omitted).

[162] Redstone's Joinder & Mot. to Dismiss ¶ 4 n.5 (Dkt. 58).

[163] *Id.*

there is no reasonably conceivable set of circumstances under which Redstone was unjustly enriched by these particular payments.[164]

## IV. CONCLUSION

For the reasons stated above, defendants' motion to dismiss is GRANTED in part and DENIED in part. This action will proceed in the manner set forth above. The parties are directed to confer and to submit an implementing order within five business days of this decision.

**IT IS SO ORDERED.**

---

[164] *See Ryan v. Gifford*, 918 A.2d 341, 361 (Del. Ch. 2007) (quoting *Schock v. Nash*, 732 A.2d 217, 232-33 (Del. 1999)) ("A defendant may be liable 'even when the defendant retaining the benefit is not a wrongdoer' and 'even though he may have received [it] honestly in the first instance.'").